IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

GLORIA CASTILLO,                          §
                                          §
        Plaintiff,                        §
                                          §
V.                                        §      CIVIL ACTION NO. H-12-3512
                                          §
CAROLYN W. COLVIN, COMMISSIONER           §
OF THE SOCIAL SECURITY                    §
ADMINISTRATION,                           §
                                          §
        Defendant.                        §

### MEMORANDUM AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Before the Court[1] in this social security appeal is Plaintiff's Motion for Summary Judgment (Document No. 12), and Defendant's cross Motion for Summary Judgment (Document No. 13). After considering the cross motions for summary judgment, the parties' additional briefing, the administrative record, the written decision of the Administrative Law Judge, and the applicable law, the Court ORDERS, for the reasons set forth below, that Plaintiff's Motion for Summary Judgment is DENIED, Defendant's Motion for Summary Judgment is GRANTED, and the decision of the Commissioner is AFFIRMED.

---

[1] On September 21, 2013, pursuant to the parties' consent, this case was transferred by the District Judge to the undersigned Magistrate Judge for all further proceedings. *See* Document No. 17.

## I.    Introduction

Plaintiff Gloria Castillo ("Castillo") brings this action pursuant to Section 205(g) of the Social Security Act ("Act"), 42 U.S.C. § 405(g), seeking judicial review of an adverse final decision of the Commissioner of the Social Security Administration ("Commissioner") denying her applications for disability insurance benefits (DIB) and supplemental security income benefits ("SSI").  Castillo argues that: (1) "The ALJ erred in his determination that Plaintiff's impairments do not meet or equal the requirements of a listed impairment;" (2) "The ALJ's credibility and residual functional capacity determinations are not supported by substantial evidence;" and (3) "The ALJ's findings that Plaintiff retains the ability to perform other work existing in significant numbers is not supported by substantial evidence and results from legal error." Plaintiff's Motion for Summary Judgment (Document No. 12) at 3.  The Commissioner, in contrast, argues that there is substantial evidence in the record to support the ALJ's decision, and that the decision comports with applicable law.

## II.    Administrative Proceedings

On or about April 14, 2010, Castillo applied for both DIB and SSI, claiming that she has been unable to work since March 19, 2010, as a result of a bipolar disorder, depression, and a learning disability.  (Tr. 122-127).  The Social Security Administration denied the applications at the initial and reconsideration stages.  After that, Castillo requested a hearing before an ALJ.  The Social Security Administration granted her request and the ALJ, Gary J. Suttles, held a hearing on August 11, 2011, at which Castillo's claims were considered *de novo*.  (Tr. 31-54).  On August 25, 2011, the ALJ issued his decision finding Castillo not disabled.  (Tr. 15-25).

2

Castillo sought review of the ALJ's adverse decision with the Appeals Council. The Appeals Council will grant a request to review an ALJ's decision if any of the following circumstances are present: (1) it appears that the ALJ abused his discretion; (2) the ALJ made an error of law in reaching his conclusion; (3) substantial evidence does not support the ALJ's actions, findings or conclusions; or (4) a broad policy issue may affect the public interest. 20 C.F.R. § 416.1470. On September 24, 2012, the Appeals Council found no basis for review (Tr. 1-3), and the ALJ's decision thus became final.

Castillo filed a timely appeal of the ALJ's decision. 42 U.S.C. § 405(g). The parties have filed cross motions for summary judgment (Document Nos. 12 & 13). The appeal is now ripe for ruling.

III.    **Standard for Review of Agency Decision**

The court's review of a denial of disability benefits is limited "to determining (1) whether substantial evidence supports the Commissioner's decision, and (2) whether the Commissioner's decision comports with relevant legal standards." *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999). Indeed, Title 42, Section 405(g) limits judicial review of the Commissioner's decision: "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." The Act specifically grants the district court the power to enter judgment, upon the pleadings and transcript, "affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing" when not supported by substantial evidence. 42 U.S.C.§ 405(g). While it is incumbent upon the court to examine the record in its entirety to decide whether the decision is supportable, *Simmons v. Harris*, 602 F.2d 1233, 1236

3

(5th Cir. 1979), the court may not "reweigh the evidence in the record nor try the issues de novo, nor substitute [its] judgment for that of the [Commissioner] even if the evidence preponderates against the [Commissioner's] decision."  *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999); *Cook v. Heckler*, 750 F.2d 391 (5th Cir. 1985).  Conflicts in the evidence are for the Commissioner to resolve.  *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992).

The United States Supreme Court has defined "substantial evidence," as used in the Act, to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales,* 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229 (1938).  Substantial evidence is "more than a scintilla and less than a preponderance."  *Spellman v. Shalala,* 1 F.3d 357, 360 (5th Cir. 1993).  The evidence must create more than "a suspicion of the existence of the fact to be established, but no 'substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"  *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

## IV.    Burden of Proof

An individual claiming entitlement to disability insurance benefits under the Act has the burden of proving his disability.  *Johnson v. Bowen*, 864 F.2d 340, 344 (5th Cir. 1988).  The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The impairment must be proven through medically accepted clinical and

laboratory diagnostic techniques. 42 U.S.C. § 423(d)(3). The impairment must be so severe as to limit the claimant in the following manner:

> he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied to work.

42 U.S.C. § 423(d)(2)(A). The mere presence of an impairment is not enough to establish that one is suffering from a disability. Rather, a claimant is disabled only if he is "incapable of engaging in any substantial gainful activity." *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting *Milam v. Bowen,* 782 F.2d 1284, 1286 (5th Cir. 1986)).

The Commissioner applies a five-step sequential process to decide disability status:

1.    If the claimant is presently working, a finding of "not disabled" must be made;

2.    If the claimant does not have a "severe impairment" or combination of impairments, he will not be found disabled;

3.    If the claimant has an impairment that meets or equals an impairment listed in Appendix 1 of the Regulations, disability is presumed and benefits are awarded;

4.    If the claimant is capable of performing past relevant work, a finding of "not disabled" must be made; and

5.    If the claimant's impairment prevents him from doing any other substantial gainful activity, taking into consideration his age, education, past work experience and residual functional capacity, he will be found disabled.

*Anthony,* 954 F.2d at 293; *see also Leggett v. Chater,* 67 F.3d 558, 563 n.2 (5th Cir. 1995); *Wren v. Sullivan,* 925 F.2d 123, 125 (5th Cir. 1991). Under this framework, the claimant bears the burden of proof on the first four steps of the analysis to establish that a disability exists. If successful, the

burden shifts to the Commissioner, at step five, to show that the claimant can perform other work. *McQueen v. Apfel,* 168 F.3d 152, 154 (5th Cir. 1999). Once the Commissioner shows that other jobs are available, the burden shifts, again, to the claimant to rebut this finding. *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990). If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends. *Leggett,* 67 F.3d at 563.

Here, the ALJ found at step one that Castillo had not engaged in substantial gainful activity since March 19, 2010, her alleged onset date. At step two, the ALJ found that Castillo's low back pain, obesity, attention deficit hyperactivity disorder, and bipolar disorder were all severe impairments. At step three, the ALJ concluded that Castillo did not have an impairment or combination of impairments that met or medically equaled a listed impairment. The ALJ then, prior to consideration of steps four and five, determined that Castillo had the residual functional capacity ("RFC") to perform a limited range of light work, including "occasionally lifting 20 pounds and frequently 10 pounds. She can sit, stand, and walk six of eight hours for a full eight hour day. Her push/pull and gross/fine dexterity is unlimited. She can climb stairs, ladders and run, but cannot climb ropes or scaffolds. She requires limited exposure to dangerous machinery. She gets along with others; can understand simple instructions; can concentrate on and perform simple tasks; and responds and adapts to workplace changes and supervision, but in a limited public/employee contact setting." (Tr. 20). At step four, using that RFC and relying on the testimony of a vocational expert, the ALJ determined that Castillo could not perform her past work as a taxicab dispatcher. At step five, using that same RFC, and considering Castillo's age, education, and work experience, and the testimony of the vocational expert, the ALJ concluded that there were jobs in significant numbers in the national and regional economy that Castillo could perform, including photocopy machine

operator, shipping receiver/weigher, and small products assembler, and that she was, therefore, not disabled.

In this appeal, Castillo first argues that the ALJ erred at step three when he determined that her mental impairment (bipolar disorder) did not meet or equal Listing 12.04.  According to Castillo, the record evidence shows that she has marked restrictions in both social functioning and maintaining concentration, persistence and pace, and that she also has had repeated episodes of decompensation.  Castillo also argues that the ALJ erred in his credibility determination and his residual functional capacity assessment because her subjective complaints and her alleged limitations are supported by the medical evidence.  Finally, Castillo argues that the ALJ's determination at step five that she can perform certain jobs is flawed because the jobs identified by the ALJ and the vocational expert require a higher reasoning level than she is capable of.

In determining whether there is substantial evidence to support the ALJ's decision, including his RFC determination, the court considers four factors: (1) the objective medical facts; (2) the diagnosis and expert opinions of treating physicians on subsidiary questions of fact; (3) subjective evidence of pain and disability as testified to by the plaintiff and corroborated by family and neighbors; and (4) the plaintiff's educational background, work history and present age.  *Wren,* 925 F.2d at 126.

## V.      Discussion

### A.      Objective Medical Evidence

The objective medical evidence in the record shows that Castillo has been diagnosed with and treated for bipolar disorder since 2009.  There are also indications in the medical record,

although no medical evidence, that Castillo has long been diagnosed with and treated for unspecified mental impairments (Tr. 283, 289).  While there is also medical evidence of Castillo's low back pain, it is Castillo's mental impairments and the limitations associated therewith that form the basis of her appeal of the Commissioner's decision denying her applications for DIB and SSI.  As such, and because there has been no claim or argument that any physical impairment has resulted in Castillo's inability to engage in substantial gainful activity, it is the record evidence that is related to Castillo's mental impairments that will be considered herein.

The objective medical evidence in the record related to Castillo's mental impairments spans the time period from March 2009, through October 2011.  On March 19, 2009, Castillo was admitted to the Cypress Creek Hospital for a psychiatric evaluation.  (Tr.  242-242; 254-257).  At that time, Castillo complained of escalating depression, characterized by feelings of hopelessness, helplessness, guilt, apathy, anhedonia, decreased concentration, and increased irritability.  She also reported that she was having problems at work, and had been accused of being agitated, emotional, and verbally abusive to others.  Upon mental status examination, Castillo was tearful but cooperative, she had fair eye contact, her speech was soft, but not pressured or slurred, her thought processes were goal directed, her recent, remote and immediate recall were all intact, she had some suicidal ideations, reported no hallucinations, and her insight and judgment were impaired.  She was determined to be suicidal, overwhelmed and depressed, and was diagnosed with major depression.  She was assessed a GAF of 20, and her prognosis was listed as guarded.   She was discharged within 24 hours and instructed to follow up with her physician.

Approximately two weeks later, on April 3, 2009, Castillo was again admitted to the Cypress Creek Hospital with suicidal thoughts. (Tr. 237-240).  Upon mental status examination, Castillo was

found to be alert, and oriented to person, place and time; her speech was coherent; her mood was

depressed and anxious; her affect was flat; her thought processes were goal directed; she admitted

to suicidal thoughts, but no homicidal ideations; she denied hallucinations; and both her insight and

judgment were poor.  She was started on antidepressant and anti-psychotic medications (Klonopin,

Ambien, Zoloft and Risperdal), and showed some improvement, with less anxiety.  By the time of

her discharge a week later, she continued to have a depressed mood, and some suicidal thoughts, but

no intentions.  She was, upon discharge, diagnosed with bipolar disorder type II, with the most recent

episode mixed with psychotic features.  Her GAF was 30.[2]

There are no treatment notes following that one-week psychiatric hospitalization until

November 18, 2009, at which time Castillo started seeing Dr. Marisa Suppatkal.  (Tr. 282-286).  On

that initial visit with Dr. Suppatkal, Castillo reported that she was not depressed, and was "doing

good," having come only to have her medications refilled.  She also reported that she had last seen

her psychiatrist in August 2009, and had been on medication for 8 months.  A mental status

---

[2] The Global Assessment of Functioning ("GAF") is a measurement "with respect only to psychological, social and occupational functioning."  *Boyd v. Apfel*, 239 F.3d 698, 708 (5th Cir. 2001) (citing DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, 4th Edition (DSM-IV), at 32).  A GAF of 51-60 denotes "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational or school functioning (e.g., few friends, conflicts with peers or co-workers).  DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, 4th Edition, Text Revision (DSM-IV-TR), at 34.  A GAF of 41-50 denotes "[s]erious symptoms (e.g., suicidal ideation, severe obsessive rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  *Id.*  A GAF of 31-40 denotes "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking or mood."  *Id.*  A GAF of 21-30 denotes that a person's "[b]ehavior is considerably influences by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day, no job, home, or friends.)."  *Id.*

examination revealed a pretty good mood with calm affect, goal-directed thought processes, no delusions, hallucinations, suicidal ideations or homicidal ideations, she was oriented x3, her recent memory was impaired, her intelligence was determined to be low average, and her insight and judgment were fair.  Dr. Suppatkal diagnosed Castillo with bipolar disorder – more depressed, attention deficient hyperactivity disorder, and dyslexia.   She prescribed continued Zoloft and Vyvanase, and recommended alternating between Ambien and Trazodone.  She assessed Castillo's GAF at 80.

On January 14, 2010, Castillo was again seen by Dr. Marisa Suppatkal, but on that date she complained of depression related to a conflict with a co-worker/friend, and sleeping problems.  (Tr. 281).  She reported to Dr. Suppatkal that she feels like everyone at work doesn't like her.  Dr. Suppatkal diagnosed Castillo with bipolar disorder and depression, increased Castillo's dosage of Trazadone, started her on Lunesta, and continued her on Zoloft and Vyvanase.  She assessed Castillo a GAF of 70.

Two weeks later, on January 27, 2010, Castillo again saw Dr. Suppatkal, having left work due to crying, suicidal ideations and feelings of hopelessness.  (Tr. 280).  Castillo reported continued sleeping problems, decreased appetite, decreased interest, feelings of guilt, and racing thoughts.  Dr. Suppatkal again diagnosed Castillo with bipolar disorder, and noted that Castillo had "poor compliance" with her medications, having not taken them for two weeks.  She did not assign Castillo a GAF on that date.  In addition, there are no further treatment or follow-up notes from Dr. Suppatkal.

On June 8, 2010, Castillo underwent a consultative mental status examination with Sheila A. Jenkins, Ph.D. (Tr. 288-291).  Castillo related that her main problems were depression, bipolar

disorder and suicidal thoughts.  She claimed that she had been working, but her depression had caused her to be fired.  She also reported that she had taken a friend's gun, wanting to shoot herself, but did not follow through with it.  Finally, Castillo related that she was currently only taking Zoloft, having run out of the other medications.  Upon mental status exam, Dr. Jenkins found Castillo to be oriented to person and place, but not time; her intelligence was below average; her motor behavior was marked by continuous movements and restlessness; her speech was garrulous; her facial expression was sad; her eye contact was appropriately focused; her mood was depressed and tearful; her demeanor was alert; her attitude was cooperative; her thought processes were tangential; her attention and concentration were mildly impaired; her immediate, recent and remote memory were intact; she could follow commands; her insight was fair to poor, her judgment was good to fair, and she had mild deficits in the area of functional and adaptive skills.  Dr. Jenkins reiterated the prior diagnosis of bipolar disorder and assessed Castillo a GAF of 60.

Following that examination, there are no medical or treatment notes in the record until approximately ten months later, when Castillo was transported by ambulance to Memorial Hermann Hospital following an attempted suicide with an overdose of Zoloft.  (Tr. 331-366).  Upon admittance to Memorial Hermann on March 30, 2011, Castillo was noted to be having suicidal ideations, as well as ongoing depressive and manic symptoms.  She was assessed a GAF of 20, and admitted voluntarily to the Harris County Psychiatric Center.  There, her mood was stabilized over a week period of time with Seroquel and Lithium.  Upon her discharge, her GAF was 44.  She was referred, for after-care, to the Mental Health Mental Retardation Authority of Harris County ("MHMRA").

At MHMRA, Castillo reported on April 11, 2011, that she had been off most of her

medications for a year, and had only been taking Zoloft, which she had obtained from a physician friend.  (Tr. 373-392).  Castillo related a history of mood swings, irritability, anger outbursts, argumentativeness, increased energy, inappropriate laughter, restlessness, pacing, hyper-talkativeness, and  paranoia.  She further related that when she's depressed she feels hopeless, has negative thinking and crying spells, isolates herself, sleeps more, has poor appetite, and suicidal thoughts.  She reported that since her discharge from the Harris County Psychiatric Center, she has been doing better, but continues to have some feelings of hypo-mania and depressed mood.  She was continued on Risperdal and Lithium, and assessed a GAF of 45 at that time.

In her follow-up aftercare appointments at MHMRA through October 2011, Castillo alternately denied any current problems (Tr. 414) and complained of ongoing anxiety and depression (Tr. 429-30; 456-57), all the while relating that she was applying for disability and did not want to work (Tr. 419, 471).  On May 9, 2011, Castillo reported feeling more agitated than normal.   (Tr. 436-440).  She also reported that she gets frustrated and anxious easily, is irritable, sometimes gets agitated, her energy level varies depending on her mood, her sleep is poor, and she has racing thoughts.  Upon mental status examination, Castillo was cooperative and alert, but she was restless and her speech volume was elevated, her mood was anxious, and her affect was labile (rapidly shifting).  She denied any suicidal ideations.  It was determined that there was only partial control of her mood symptoms, and her medications were adjusted.  By May 24, 2011, Castillo reported, as reflected in a Nursing Services Note, that her symptoms were "good;" she was oriented x3, was calm and cooperative, her mood was euthymic (normal), her speech was logical and goal-directed, and her "target symptoms" had improved.  (Tr. 432-435).  But, two days later, in a "Patient and Family Education Progress Note" dated May 26, 2011, Castillo reported that she had been "very depressed

lately," with crying spells and little sleep.  (Tr. 429-430).

During a July 6, 2011, Medication Maintenance visit at MHMRA, Castillo reported that she was "doing better with her mood with increase of lithium but still some depression, mood swings, frustrated, irritable.  Her hyperactivity is better."  (Tr. 424-427).  A mental status examination found Castillo cooperative and alert, but restless, she had a normal rate and rhythm of speech, her mood was anxious and dysthymic (depressed), her affect was appropriate, her thought processes were goal directed, she had no suicidal ideations, her insight was fair and her judgment was limited.  Partial improvement of her mood symptoms with the increased dosage of Lithium was noted, but her medications were further adjusted, with another increase in the Lithium dosage, and the addition of Risperdal and Inderal.  A week later, on July 13, 2011, as reflected in a "Nursing Services Note" and a "Patient and Family Education Progress Note," Castillo "denied any present problems" and was in a "good mood."  (Tr. 414-415).   That "happy mood" continued through August 9, 2011, despite the fact that Castillo reported being off her medications for two weeks.  (Tr. 464).  At a Medication Maintenance visit on August 10, 2011, Castillo reported that she was "doing fairly well.  With increase of lithium the hypomanic sxs [symptoms] have gotten much better.  She also reports most of her depressive sxs [symptoms] are controlled."  (Tr. 458-462).  A mental status examination on that date found Castillo cooperative and alert, with normal motor activity and normal rate and rhythm of speech, her mood was euthymic but anxious, her affect was appropriate, her thought processes were goal directed, she had no suicidal ideations, and her insight and judgment were fair.

A month later, on September 12 and 15, 2011, Castillo was in a "sad" mood, and reported that she had decided to seek employment after being denied disability.  (Tr.  456-457).  By September 22, 2011, her mood had improved and she was resigned to seeking work regardless of

13

the outcome of the appeal of her disability application.  By October 20, 2011, the last MHMRA visit in the record, Castillo was again experiencing depressive symptoms, but acknowledged that she had been off her medications for "a while." (Tr. 442-453).  When she was off her medications she "was having suicidal thoughts." Once her medications were re-started, her symptoms improved.   (Tr. 442).

A close and chronological review of the objective medical evidence in the record supports the ALJ's conclusion that Castillo did not meet or equal Listing 12.04.  Listing 12.04 provides for presumptive disability for affective disorders as follows:

> 12.04 Affective Disorders: Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.
>
> The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.
>
> A. Medically documented persistence, either continuous or intermittent, of one of the following:
>
> 1. Depressive syndrome characterized by at least four of the following:
>
> a. Anhedonia or pervasive loss of interest in almost all activities; or
>
> b. Appetite disturbance with change in weight; or
>
> c. Sleep disturbance; or
>
> d. Psychomotor agitation or retardation; or
>
> e. Decreased energy; or
>
> f. Feelings of guilt or worthlessness; or
>
> g. Difficulty concentrating or thinking; or
>
> h. Thoughts of suicide; or
>
> I. Hallucinations, delusions or paranoid thinking; or
>
> 2. Manic syndrome characterized by at least three of the following:
> a. Hyperactivity; or
>
> b. Pressure of speech; or
>
> c. Flight of ideas; or

14

d. Inflated self-esteem; or

e. Decreased need for sleep; or

f. Easy distractibility; or

g. Involvement in activities that have a high probability of painful consequences which are not recognized; or

h. Hallucinations, delusions or paranoid thinking;

Or

3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes);

And

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration;

Or

C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1. Repeated episodes of decompensation, each of extended duration; or

2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

Here, the ALJ concluded that Castillo's mental impairments did not meet or equal the paragraph "B"

criteria of Listing 12.04:

In activities of daily living, the claimant has mild restriction because she is able to care for herself, brush her teeth, dress herself, maintain her personal hygiene, make her bed, shop, cook, drive, take out the trash, and watch television (Exhibit 4F/3-4; Exhibit 7F/4; Hearing Testimony)

In social functioning, the claimant has moderate difficulties.  During her physical and mental consultative examinations (CEs), claimant was alert, oriented, and able to converse appropriately (Exhibit 4F/3; Exhibit 7F/4) and during her mental CE, she had appropriate eye contact and rapport was easily established and maintained (Exhibit 4F/3).  She also has a negative and positive relationship with her daughter (Exhibit 4F/1).

With regard to concentration, persistence or pace, the claimant has moderate difficulties.  The consultative examiner noted claimant's attention and concentration were mildly impaired, immediate and remote memory were intact, insight was fair to poor, and judgment was good to fair (Exhibit 4F/3).

As for episodes of decompensation, the record is void of any evidence of episodes of decompensation, which have been of extended duration.  Pursuant to 12.00(C)(4), an extended duration "means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks."

Because the claimant's mental impairments do not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, the "paragraph B" criteria are not satisfied.

(Tr. 19).  That conclusion is supported by the objective medical evidence, including the mental status examinations of November 18, 2009 (Tr. 282-286), January 14, 2010 (Tr. 281), January 27, 2010 (Tr. 280), April 11, 2011 (Tr. 373-392), July 6, 2011 (Tr. 424-427) and October 20, 2011 (Tr. 442), which show that Castillo's depressive symptoms, and her suicidal ideations, manifest themselves when she fails to take her medications.  When taking her medications regularly, Castillo's mental status examinations reveal no more than moderate symptoms (Tr . 282-286) and nothing more than moderate difficulties in social functioning or maintaining concentration, persistence or pace.  The ALJ's conclusion that Castillo did not meet or equal Listing 12.04 is also supported by the objective medical evidence, which shows that Castillo has not had *repeated* episodes of decompensation, each of extended duration.  There are two one-week psychiatric hospitalizations in the record – one in April 2009, and the other in April 2011 – two years apart.  Neither hospitalization was for an

"extended" period of time, and, even if each hospitalization and its immediate aftermath could be considered an episode of decompensation *of extended duration*, there is no evidence in the record that such episodes were "repeated" within the meaning of 12.00(C)(4) ("The term repeated episodes of decompensation, each of extended duration in these listings means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks."). The objective medical evidence factor therefore supports the ALJ's conclusion at step three.

The objective medical evidence in the record also supports the ALJ's determination that Castillo can engage in substantial gainful activity. Much of Castillo's severe depressive symptoms, and some of her lowest of her GAF scores, occurred in 2009, while Castillo was working as a taxicab dispatcher. Moreover, each severe episode was occasioned by Castillo's failure to take her psychiatric medications. In 2009, at the time of her hospitalization, Castillo had not been taking any psychiatric medications. In 2011, Castillo had been off all her medications, other than Zoloft, for over a year. The objective medical evidence in the record supports the ALJ's conclusion that Castillo's bipolar disorder is controllable with medication, and that Castillo can engage in the limited range of light work found by the ALJ in assessing her RFC. The objective medical evidence factor supports the ALJ's decision.

### B.    Diagnosis and Expert Opinions

The second element considered is the diagnosis and expert opinions of treating and examining physicians on subsidiary questions of fact. Unless good cause is shown to the contrary, "the opinion, diagnosis and medical evidence of the treating physician, especially when the consultation has been over a considerable length of time, should be accorded considerable weight." *Perez v. Schweiker,* 653 F.2d 997, 1001 (5th Cir. 1981); *see also Newton v. Apfel*, 209 F.3d 448, 455

(5th Cir. 2000) ("The opinion of the treating physician who is familiar with the claimant's impairments, treatments and responses should be accorded great weight in determining disability."). In addition, a specialist's opinion is generally to be accorded more weight than a non-specialist's opinion. *Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir. 1994); *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990). For the ALJ to give deference to a medical opinion, however, the opinion must be more than conclusory and must be supported by clinical and laboratory findings. *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985); *Oldham v. Schweiker*, 660 F.2d 1078 (5th Cir. 1981). Further, regardless of the opinions and diagnoses and medical sources, "'the ALJ has sole responsibility for determining a claimant's disability status.'" *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995) (quoting *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990)).

There are no expert medical opinions in the record that Castillo meets a listing, or is otherwise unable to engage in substantial gainful activity; in fact, the expert medical opinions in the record are directly to the contrary. As set forth above, Dr. Jenkins conducted a consultative mental status examination of Castillo on June 8, 2010 (Tr. 288-291). While diagnosing Castillo with bipolar disorder, she assessed Castillo a GAF of 60, which denotes "moderate symptoms" or a "moderate difficulty in social, occupational or school functioning." In addition, Dr. Jenkins found that Castillo's attention and concentration were only mildly impaired and that she only had mild deficits in the area of functional and adaptive skills. That opinion of Dr. Jenkins is consistent with the expert medical opinion of John Ferguson, Ph.D. (Tr. 294-310), who reviewed Castillo's medical and mental health records and concluded that she only had only a mild restriction on the activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace (Tr. 304), and could "understand, remember, and carry out only

simple instructions, make simple decisions, attend and concentration for extended periods, interact adequately with co-workers and supervisors, [and] respond appropriately to changes in routine work setting." (Tr. 310).

The expert medical opinions in the record all support the ALJ's step three finding, as well as the ALJ's RFC.

### C.    Subjective Evidence of Pain and Disability

The third element considered is the subjective evidence of pain and disability, including the claimant's testimony and corroboration by family and friends.  Not all pain and subjective symptoms are disabling, and the fact that a claimant cannot work without some pain or discomfort will not render him disabled.  *Cook,* 750 F.2d at 395.   In an appeal of a denial of benefits, the Act requires this Court's findings to be deferential.  The evaluation of evidence concerning subjective symptoms is a task particularly within the province of the ALJ, who has the opportunity to observe the claimant. *Hames v. Heckler,* 707 F.2d 162, 166 (5th Cir. 1983).

Castillo testified at the hearing on August 11, 2011, that she can't work because she cannot finish tasks, she is too slow to complete job tasks, she is not motivated, and she gets paranoid when she's around others (Tr. 44-45).  While Castillo admitted that her medications help her symptoms, they do not alleviate them.  (Tr. 45).   The ALJ found Castillo's testimony and her subjective complaints about the severity of her mental impairments not fully credible.  In doing so, the ALJ wrote:

> As a result of her impairments, claimant alleges that she is paranoid, does not complete tasks, is not motivated, can sit 1 hour, and stand 30 minutes (Hearing Testimony).  She also reported her impairments affect lifting, squatting, bending, reaching, sitting, talking, hearing, seeing, memory, completing tasks, concentration, understanding, and getting along with others (Exhibit 11E/6).

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

Claimant repeatedly makes contradictory statements regarding her activities of daily living.  During her CE, claimant reported she is able to care for herself, brush her teeth, dress herself, maintain her personal hygiene, make her bed, shop, cook, and drive (Exhibit 4F/3-4; Exhibit 7F/4).  She testified she has not been treated for any physical impairments.  On the contrary, in her Function Report, she stated she wears the same clothes for thee days, bathes twice per week, "never" cooks, and does not drive (Exhibit 11E/2-4).  Although the inconsistent information provided by the claimant may not be the result of a conscious intention to mislead, nevertheless the inconsistencies suggest that the information provided by the claimant generally may not be entirely reliable.

Claimant also stated she "does not wish to work. . . and [is] worried that working may change eligibility [for disability]" (Exhibit 14F/11; Exhibit 16F/9).  She previously was on disability and has applied four previous times.  I find the claimant has no motivation to return to work based on non-medical factors.

*  *  *

Claimant states she has "severe problems" due to her mental impairments, she becomes nervous, and has difficult relationships with her family and friends (Exhibit 4F/1).  In April 2009, claimant was hospitalized for suicidal ideation; however, she later requested to be discharged (Exhibit 1F/1).  In November 2009, she stated she was "very content, happy," was not depressed, was "doing good," and her GAF was 80, indicating that if symptoms were present, they were transient and expectable reactions to psychosocial stressors and no more than a slight impairment in social, occupational, or school functioning (Exhibit 3F/5, 9).  In March 2011, the claimant went to the emergency room for an overdose on her Zoloft but later denied suicidal ideation (Exhibit 12F/6; Exhibit 13F/6).  While hospitalized, claimant's GAF range was from 20-38 (Exhibit 1F/2, 4, 6), but then increased to 60-80 after release (Exhibit 3F/4, 9; Exhibit 4F/4).  In April 2011, she reported she was "doing better" (Exhibit 14F/11).  In July 2011, she was "doing a lot better" and denied "any present problems" and suicidal or homicidal ideation (Exhibit 16F/4, 8-9).  Claimant takes medication to treat her mental impairments (Exhibit 15F/1).  I find her consistently high GAF scores to the 80's, except while situationally being an inpatient under treatment, reveal a significantly greater mental functional ability than alleged.

Additionally, claimant is also able to care for herself, brush her teeth, dress herself,

maintain her personal hygiene, make her bed, shop, cook, drive, take out the trash, watch television, have appropriate eye contact, and establish and maintain rapport easily (Exhibit 4F/3-4; Exhibit 7F/4; Hearing Testimony). The fact that claimant can engage in the foregoing activities indicates that she is not totally precluded from all work related activities. Therefore, the evidence as a whole does not indicate that claimant's impairments, considered separately or in combination are as limited as alleged.

(Tr. 21-22). [3]

Credibility determinations, such as that made by the ALJ in this case in connection with Castillo's subjective mental complaints, are generally within the province of the ALJ to make. *See Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994) ("In sum, the ALJ 'is entitled to determine the credibility of medical experts as well as lay witnesses and weigh their opinions accordingly.'") (quoting *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985)), *cert. denied*, 514 U.S. 1120 (1995). Here, the ALJ supported his credibility determination with references to the medical evidence and the testimony about Castillo's activities. In addition, the ALJ's credibility determination is supported by Castillo's repeated comments to MHMRA that she didn't want to work, she was applying for disability, and she was concerned that working could change her eligibility for disability. Accordingly, the subjective complaints factor, when viewed in the context of the ALJ's supported credibility determination, also supports the ALJ's decision.

### D.  Education, Work History and Age

The fourth element considered is the claimant's educational background, work history and present age. A claimant will be determined to be disabled only if the claimant's physical or mental

---

[3] The ALJ's reference to GAF scores in the 60-80 range following Castillo's hospitalization from March 30, 2011, to April 6, 2011, is incorrect. The GAF scores in the 60-80 range were from November 18, 2009, January 14, 2010, and June 8, 2010. Castillo's treatment and after-care notes from MHMRA in 2011 do not appear to contain any GAF scores.

impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  42 U.S.C. § 423(d)(2)(a).

Here, at the time of the administrative hearing before the ALJ, Castillo was fifty years old, she had a high school education, and past relevant work as call taker/dispatcher.  Taking this vocational information, the ALJ questioned the vocational expert as follows about whether a person of Castillo's age, education, past work experience, and RFC could perform her past work, or any other jobs that exist in significant numbers in the regional and national economy:

> Q:   All right.   We've got a younger individual here, and individual closely approaching an advanced age.  She's got a high school education.  Exertional ability to occasionally lift 20 pounds, 10 pounds frequently, sit, stand and walk in ability six of eight.  Her push, pull and gross fine is unlimited.
>
> And she can climb stairs, ladders.  No ropes, scaffolds or running.  She can bend, stoop, crouch, crawl, balance, twist and squat.  Limited exposure to dangerous machinery.  She has the ability to get along with others.
>
> She can understand at least simple instructions, concentrate and perform simple tasks, and respond and adapt to workplace changes and supervision, but in limited public, employee contact settings.
>
> Based on those elements, can she do any past work?
>
> A:      No, Your Honor.
>
> Q:      Any transferrables?
>
> A:      Not to, even just to a lower SVP would be to ask you to work some numbers, no.  I don't think she could.
>
> Q:      All right.  What other work if any could be done with those limitations?
>
> A:      Okay.  She could work as a photo machine, photocopy, did you?  One moment.  Did you indicate anything in the hypothetical about a machine in terms of within the dangers?

Q:      Just dangerous machinery.

A:      Okay.  Photocopy.

Q:      That's probably fairly innocuous, isn't it.  I mean it's not considered a - -

A:      No.  I just wanted to clarify.

Q:      Yes, sir.

A:      Photo copy machine operator, DOT code 207.685-014.   In the national economy 165,000, in the regional 700.

         Shipping receiving weigher, DOT code 222.387-074.   In the national economy 155,000, in the region 600 jobs.

         Small products assembler, DOT code 739.687-030.  In that national economy 205,000 jobs, in the area, or the regional economy 1,100 jobs.

(Tr. 49-51).

        "A vocational expert is called to testify because of his familiarity with job requirements and working conditions.   'The value of a vocational expert is that he is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed.'" *Vaughan v. Shalala*, 58 F.3d 129, 132 (5th Cir. 1995) (quoting *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986)).  It is well settled that a vocational expert's testimony, based on a properly phrased hypothetical question, constitutes substantial evidence.  *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994).  Where the testimony of a vocational expert directly and obviously conflicts with information in the Dictionary of Occupational Titles ("DOT"), and where the issue of disability is determined at steps four or five, "the probative value and reliability of the [vocational] expert's testimony" is called into question. *Carey v. Apfel*, 230 F.3d 131, 147 (5th Cir. 2000).   Where, however, the testimony of a vocational expert only indirectly or impliedly conflicts with information

and job descriptions in the DOT, the ALJ may rely upon the vocational expert's testimony provided

that the record reflects an adequate basis for doing so. *Id.* at 146-147.

Here, Castillo argues as follows that the vocational expert's testimony as to the type of jobs

she can perform within the RFC assessed by the ALJ is inconsistent with the information in the DOT

as to the mental requirements for such jobs:

> While all of these jobs [identified by the vocational expert] are unskilled, two of
> them require a reasoning level of two and the other requires a reasoning level of
> three, all of which exceed Plaintiff's RFC.  The ALJ determined that Plaintiff could
> perform jobs that required the ability to understand, remember and carry out no more
> than "simple instructions." (Tr. 20).
>
> However, according to the Dictionary of Occupational Titles (DOT), the jobs
> of photocopy machine operator, and small parts assembler have reasoning levels of
> two, which means that the worker must be able to apply commonsense understanding
> to carry out detailed but uninvolved written or oral instructions.  The job of shipping
> receiver weigher requires a reasoning level of three, which means the worker must
> be able to apply commonsense understanding to carry out instructions furnished in
> written, oral, and diagrammatic form, and to deal with problems involving concrete
> variables in and from standardized situations.  DOT, App. C.  These requirements
> exceed Plaintiff's ability to understand, remember and carry out only simple
> instructions, as determined by the ALJ.  (Tr. 20).  Only jobs with a reasoning level
> of one, which requires the worker to apply commonsense understanding to carry out
> simple one or two-step instructions and to deal with standardized situations with
> occasional variables in and from the situations encountered on the job, would have
> been consistent with Plaintiff's RFC.  All of the jobs found by the ALJ to be jobs that
> Plaintiff retains the ability to perform require a reasoning level of greater than one.

Plaintiff's Motion for Summary Judgment (Document No. 12) at 13-14.

Two of the jobs identified by the vocational expert are listed in the DOT as requiring a

reasoning level of two.  A reasoning level of two under the DOT requires the ability to "[a]pply

commonsense understanding to carry out detailed but uninvolved written or oral instructions. Deal

with problems involving a few concrete variables in or from standardized situations." DICTIONARY

OF OCCUPATIONAL TITLES, Appendix C.  A reasoning level of two has repeatedly been found to be

consistent with the reasoning ability to understanding simple instructions and perform simple tasks. *See Gaspard v. Social Security Administration*, 609 F.Supp.2d 607, 617 (E.D. Tex. 2009) ("a limitation of 'simple one or two-step tasks on a repetitive basis where concentration really isn't required' does not *necessarily* preclude ability to perform jobs with reasoning levels of 2 or higher"); *Carter v. Commissioner*, No. 6:12-cv-265, 2013 WL 2318886 *9 (E.D. Tex. May 28, 2013) ("an occupational Reasoning Level of 2 or below is within the ambit of 'simple' type limitations"); *Tanner v. Astrue*, No. 1:11-cv-343, 2013 WL 149684 *3, n.5 (E.D. Tex. Jan. 14, 2013) ("a limitation to simple and repetitive tasks does not necessarily preclude jobs with a reasoning level of 2 or higher . . . "); *Gonzalez v. Astrue*, No. H-11-1439, 2012 WL 1458094 *8 (S.D. Tex. Apr. 26, 2012) (a RFC limiting a claimant to "no more than simple repetitive tasks and occasional interaction with co-workers, supervisors and members of the general public" was not inherently inconsistent with a vocational expert's testimony that the claimant could perform jobs listed in the DOT as requiring a reasoning level of 2); *Holman v. Astrue*, No. H-10- 2110, 2011 WL 3847146 *9 (S.D. Tex. Aug. 30, 2011) (concluding that a job with a reasoning level of 2 "'is consistent with a RFC to perform simple, routine, repetitive work tasks'"); *see also Hackett v. Barnhart*, 395 F.3d 1168, 1176 (10th Cir. 2005) (a reasoning level of 2 under the DOT appears consistent with a limitation to "simple and routine work tasks"); *Money v. Barnhart*, 91 F. App'x 210, 215 (3d Cir. 2004) ("[w]orking at [a] reasoning level 2 would not contradict the mandate that [the claimant's] work be simple, routine and repetitive").  As such, and contrary to Castillo's argument, jobs with a DOT reasoning ability of two are not inherently inconsistent with Castillo's ability to understand simple instructions and perform simple tasks.

As for Castillo's argument that "simple" tasks are only those that require a reasoning level of one under the DOT, such an argument has no support in the DOT itself.  The DOT does not classify jobs by whether they require "simple" or "detailed" understanding or whether they require the performance of "simple" or "detailed" tasks.  Instead, the  DOT classifies jobs by reasoning levels, and those reasoning levels are not defined by terms such as "simple" or "detailed."  As such, there is no direct or obvious conflict between the DOT and the vocational expert's testimony as to the mental requirements for the jobs of photocopy machine operator and small parts assembler.

Because the term "simple" is not inconsistent with a reasoning level of two under the DOT, and because the vocational expert identified two jobs that were consistent were Castillo's RFC and her ability to perform simple tasks and understand simple instructions, the vocational expert's testimony provides substantial evidentiary support for the ALJ's decision at step five.

## VI.    Conclusion and Order

Based on the foregoing, and the conclusion that substantial evidence supports the ALJ's decision, it is

ORDERED that Defendant's Motion for Summary Judgment (Document No. 13) is GRANTED, Plaintiff's Motion for Summary Judgment (Document No. 12) is DENIED, and the decision of the Commissioner is AFFIRMED.

Signed at Houston, Texas, this 5th day of March, 2014.

Frances H. Stacy
United States Magistrate Judge